IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

DIANNA LYNN BROWN,

    Plaintiff,

v.

NANCY A. BERRYHILL, Acting Commissioner of Social Security,

    Defendant.

6:16-CV-00047-JO

OPINION AND ORDER

JONES, J.,

Plaintiff Dianna Brown appeals the Commissioner's decision denying her concurrent applications for disability insurance benefits and supplemental security income under Titles II and XVI of the Social Security Act. The court has jurisdiction under 42 U.S.C. § 405(g). I AFFIRM the Commissioner's decision.

## PRIOR PROCEEDINGS

Brown alleged disability beginning in March 2001, due to post traumatic stress disorder (PTSD), depression, anxiety, bipolar disorder, and chronic joint pain from arthritis. Admin. R. 225, 275. At the administrative hearing she amended the alleged onset of disability to October 2, 2010, the date she last worked. Admin. R. 49. Brown satisfied the insured status requirements under the Act through December 31, 2015, and must establish that she was disabled on or before that date to prevail on her Title II claim. *Tidwell v. Apfel,* 161 F.3d 599, 601 (9th Cir. 1998).

-1-    OPINION AND ORDER

The ALJ applied the sequential disability determination process described in 20 C.F.R. sections 404.1520 and 416.920. *See Bowen v. Yuckert*, 482 U.S. 137, 140 (1987). The ALJ found Brown's ability to perform basic work activities adversely affected by osteoarthritis of the knees, bipolar disorder with depression, personality disorder, PTSD, and a history of alcohol abuse. Admin. R. 18. The ALJ found that, despite these impairments, Brown retained the residual functional capacity ("RFC") to perform a range of work at the medium level of exertion, with limited postural activities, such as crawling, kneeling, stooping, climbing and so forth, and no more than occasional interactions with supervisors, coworkers, and the general public. Admin. R. 20-36.

The vocational expert ("VE") testified that a person having Brown's age, education, work experience, and RFC could perform the activities required in unskilled occupations such as motel cleaner, hand packager, price marker, and industrial cleaner, which, in combination, represent hundreds of thousands of jobs in the national economy. Admin. R. 37-38, 72-73. The ALJ concluded that Brown was not disabled within the meaning of the Social Security Act. Admin. R. 38.

## STANDARD OF REVIEW

The district court must affirm the Commissioner's decision if it is based on proper legal standards and the findings of fact are supported by substantial evidence in the record as a whole. *Tommasetti v. Astrue*, 533 F.3d 1035, 1038 (9th Cir. 2008). Substantial evidence is relevant evidence that a reasonable person might accept as adequate to support a conclusion. *Richardson v. Perales*, 402 U.S. 389, 401 (1971). Substantial evidence may be less than a preponderance of the evidence. *Robbins v. Soc. Sec. Admin.*, 466 F.3d 880, 882 (9th Cir. 2006). Under this standard, the court must consider the record as a whole, and uphold the Commissioner's factual findings that are

supported by inferences reasonably drawn from the evidence even if another interpretation is also rational. *Robbins*, 466 F.3d at 882; *Batson v. Comm'r of Soc. Sec. Admin.*, 359 F.3d 1190, 1193 (9th Cir. 2004); *Andrews v. Shalala*, 53 F.3d 1035, 1039–40 (9th Cir. 1995).

## ASSIGNMENTS OF ERROR

The plaintiff bears the burden of showing that the ALJ erred and that any error was harmful. *McLeod v. Astrue*, 640 F.3d 881, 886-87 (9th Cir. 2011). Brown contends the ALJ failed to fully develop the record regarding her mental impairments. She contends the ALJ improperly discredited her subjective statements about her symptoms and discounted the global assessment of functioning ("GAF") scores assigned by mental health providers. Brown argues that these errors led the ALJ to elicit testimony from the VE based on hypothetical assumptions that did not accurately reflect all of her functional limitations and to erroneously conclude that she is not disabled.

## DISCUSSION

### I.   Development of the Record

Brown contends the ALJ failed to fully develop the record because he denied her request for a consultative psychological evaluation. Admin. R. 49, 302. An ALJ has a duty to assist the claimant in developing the record. *DeLorme v. Sullivan*, 924 F.2d 841, 849 (9th Cir. 1991). The ALJ did so in case, by obtaining medical records, written statements, and testimony from the health care providers and third party witnesses Brown identified. *See Bowen v. Yuckert*, 482 U.S. 137, 140 n. 5 (1987) (The claimant is in the best position to provide information about his medical condition and identify sources of such information). An ALJ's duty to develop the record further is triggered only when the ALJ finds it is necessary to resolve an ambiguity or when the record is inadequate to

allow for proper evaluation of the claim. *Tonapetyan v. Halter*, 242 F.3d 1144, 1150 (9th Cir. 2001); *Mayes v. Massanari*, 276 F.3d 453, 459-60 (9th Cir. 2001).

Brown contends the record is ambiguous regarding her mental impairments because there were a variety of provisional diagnoses by different health care providers, including possible mood disorders, such as major depression and cyclothymic disorder, anxiety, and personality disorder. Admin. R. 444, 474, 758. The ALJ did not find an ambiguity or inadequacy here that would require further development of the record. *Mayes*, 276 F.3d at 459-60; *Tonapetyan*, 242 F.3d at 1150. The ALJ reviewed the treatment records and considered the expert opinion of the state agency psychological consultant. He found that the record supported diagnoses of bipolar disorder with depression, personality disorder, and PTSD. Admin. R. 18.

Even if the provisional diagnoses suggested a lack of unanimity regarding the most appropriate diagnostic impression, the record as a whole made both the nature and severity of Brown's functional limitations from mental impairments reasonably clear. The treatment records show that Brown's primary functional limitations were social difficulties, including distrust of others and aggression in response to situations in which she felt she had been treated with disrespect. Admin. R. 18-20, 24-29, 32, 109-112, 377, 380, 381, 385, 387, 396, 409, 742, 743, 748, 749, 754, 875, 878, 883. The ALJ found that Brown's reported activities provided a basis to reasonably estimate the degree of her limitations. Brown was capable of social interactions such as attending church, being involved in her church community, living in a dormitory setting, daily grocery shopping, visiting neighbors and friends, and using public transportation, among other activities. Admin. R. 21, 24-27, 29-30, 36, 241-243, 286-287.

In summary, the ALJ determined that the case record, including Brown's treatment records, reported activities, and other relevant matters, provided sufficient evidence to fully evaluate the nature and severity of her functional limitations from mental impairments. Accordingly, he found an additional consultative evaluation unnecessary. Admin. R. 15. The ALJ accommodated Brown's reported social difficulties by limiting her RFC to work involving only occasional interactions with others. Admin. R. 20. Brown did not allege additional functional limitations that a consultative evaluation would support. She merely suggested that a consultative evaluation might produce some evidence of disability. Such speculation does not trigger the ALJ's duty to develop the record further. *Mayes*, 276 F.3d at 461.

## II. Evaluation of Subjective Symptoms

In her application papers, Brown said she last worked in October 2010 when she was fired for reasons unrelated to disability. She said PTSD, depression, anxiety and arthritis limited her ability to work. Admin. R. 225. She could walk about one block and then would need to rest for 15 minutes. She had difficulty with memory and concentration, but could pay attention "as long as needed" and could follow clear instructions. Admin. R. 243. Brown said she got along with authority figures, as long as they did not have a bad attitude. She could handle stress pretty well, but had difficulty with changes in routine. Admin. R. 244. In a later report, Brown said she could not stand or sit without pain in her joints and muscles. She did not like to have people near her. Brown said she had difficulty concentrating and problematic mood swings. Admin. R. 283. Inconsistently with her earlier function report, Brown said she did not get along well with authority figures and had difficulty handling stress. Admin. R. 288-289.

At the administrative hearing, Brown said that difficulty being around people and bad mood swings kept her from doing any sort of work. Admin. R. 52. She sometimes experienced episodes in which she felt really down and would not talk to anyone. If someone treated her with disrespect, she would become angry and confront them. Admin. R. 58.

The ALJ found that Brown's medically determinable impairments could reasonably be expected to produce some of the symptoms she alleged and he did not identify affirmative evidence of malingering. Admin. R. 22. Under such circumstances, an ALJ must assess the credibility of the claimant's statements about the severity of symptoms. Here, the ALJ did so and concluded that Brown's statements suggesting that her symptoms were so persistent and intense that their limiting effects precluded any sort of work were not entirely credible. Admin. R. 22. As reflected in the RFC assessment, the ALJ believed that Brown's arthritis limited her activities, and that her mental impairments limited her ability to work in frequent contact with others. He discounted her statements, only to the extent she claimed that her symptoms precluded her from work with limited climbing, kneeling, stooping and so forth and with only occasional interactions with others at work. Admin. R. 20.

An adverse credibility determination must include specific findings supported by substantial evidence and clear and convincing reasons. *Carmickle v. Comm'r, Soc. Sec. Admin.*, 533 F.3d 1155, 1160 (9th Cir. 2008); *Smolen v. Chater*, 80 F.3d 1273, 1281-82 (9th Cir. 1996). The findings must be sufficiently specific to permit the reviewing court to conclude that the ALJ did not arbitrarily discredit the claimant's statements. *Tomasetti v. Astrue*, 533 F.3d at 1039.

In assessing credibility, an ALJ must consider all the evidence in the case record, including the objective medical evidence, the claimant's treatment history, medical opinions, daily activities,

work history, the observations of third parties with knowledge of the claimant's functional limitations, and any other evidence that bears on the consistency and veracity of the claimant's statements. *Tommasetti*, 533 F3d at 1039; *Smolen*, 80 F3d at 1284; SSR 16-3p, *available at* 2016 WL 1110029 (2016).

The ALJ's decision demonstrates that he performed a thorough review of all the evidence relating to proper factors for evaluating the intensity, persistence and limiting effects of Brown's symptoms. Admin. R. 20-36. He considered the objective medical evidence and Brown's treatment history, and found that this evidence did not support the claim that her physical impairments preclude her from work with the postural limitations in the RFC assessment. Admin. R. 22, 34. This finding is supported by substantial evidence in the record.

As a baseline for her physical symptoms, the ALJ noted that before the alleged onset of disability, Brown already complained of chronic pain in the lower extremities but diagnostic imaging showed only early signs of mild, marginal osteoarthritis. Admin. R. 22, 677, 711-715. Notably, the medical records do not indicate any change in her physical health at the alleged onset of disability in October 2010. After the alleged onset of disability, Brown had a normal physical examination in August 2011; she said she felt excellent and had no complaints of physical pain. Admin. R. 22, 383.

In February 2012, Brown said she had chronic back pain that was "not particularly bothersome" with no lower extremity weakness or difficulty walking or climbing stairs. On physical examination, Brown had a smooth, well coordinated gait, normal tandem gait, normal heel to toe walk, no difficulty rising from sitting, and no discomfort getting on and off the examination table. Her physical examination was entirely benign, showing full ranges of motion without discomfort, full muscle strength, and intact reflexes and sensation. Admin. R. 23, 369. In November 2012,

Brown sprained her right ankle but was able bear weight and ambulate without difficulty. She had mild tenderness in her right knee, but retained full range of motion without effusion or signs of laxity in the ligaments. Admin. R. 23, 649-650, 750.

In February 2014, Brown saw an orthopedic specialist for increased pain in both knees. Diagnostic imaging showed moderate osteoarthritis without joint effusion or soft tissue swelling. Physical examination revealed that Brown had full muscle strength without laxity in the ligaments. Dr. Stephen Shah recommended steroid injections, which Brown declined. He then recommended treatment with nonsteroidal anti-inflammatory drugs ("NSAIDS") and low impact exercise. Admin. R. 24, 845-849. Brown returned for a second opinion regarding knee pain. Peter Patricelli, M.D., agreed with Dr. Shah that Brown's objective findings supported conservative treatment with NSAIDs and Tylenol. Admin. R. 24, 835. In March 2014, Brown had another physical examination for complaints of joint pain, and Mary Loeb, M.D. encouraged her to exercise and to avoid long periods of sitting. Admin. R. 24, 831-832.

These relatively benign objective findings do not support the presence of debilitating arthritis symptoms. *Lingenfelter v. Astrue,* 504 F.3d 1028, 1040 (9th Cir. 2007); *Burch v. Barnhart,* 400 F.3d 676, 681 (9th Cir. 2005). Likewise, the conservative treatment Brown received suggests her symptoms were not so severe as to preclude any work activity. *Parra v. Astrue,* 481 F3d 742, 750-51 (9th Cir. 2007); *Meanal v. Apfel,* 172 F3d 1111, 1114 (9th Cir. 1999).

Similarly, the ALJ considered the objective findings and treatment notes of the psychiatrists and counselors who treated Brown for mental health issues. He concluded this evidence showed that Brown functioned well when stable on medications. Admin. R. 24, 34-35. The longitudinal record describes a pattern of generally moderate depression symptoms with exacerbations during periods

-8- OPINION AND ORDER

of medication adjustment and situational stressors, including financial difficulty, homelessness, and her strained relationship with her father.

Brown established care with her counselor, Jordan Shin, in July 2009, the year before the alleged onset of disability. She complained of stress, anxiety, and depression, and endorsed mild symptoms on a depression inventory. She divulged a history of substance abuse, including marijuana, methamphetamine, and cocaine, and current heavy alcohol use. Admin. R. 692-694. In October 2009, Brown saw psychiatrist Alfredo Velez, M.D., for depression associated with situational stressors. He noted that Brown appeared well and fully oriented with full affect, euthymic mood, and logical thought processes and associations. Her cognition was intact. Brown had an average fund of knowledge with good insight and judgment. Dr. Velez prescribed an antidepressant. Admin. R. 682.

The records do not reflect any change in her mental health at the time her disability allegedly began in October 2010. Ms. Shin said that Brown appeared to be functioning well, speaking freely with appropriate affect, and remaining cheerful and relaxed, even when talking about potentially distressing events. Admin. R. 24, 409, 411. In October 2010, Brown told Ms. Shin that she had been fired from her job. Despite this potentially stressful situation, Ms. Shin said Brown appeared to be coping and functioning well. Admin. R. 24, 405. In December 2010, Brown told Ms. Shin she was minimally depressed and coping well with stress from the holidays, bad weather, being alone and other stressors. Admin. R. 24, 396. In January 2011, Ms. Shin observed that Brown continued to function well and wanted to discontinue counseling with continued medication management. Admin. R. 395. In July 2011, Brown told Ms. Shin that she had increased stress because her mother was in the hospital. She appeared to be functioning well and coping with the stress. Admin. R. 24-

25, 387. At a follow up medical appointment with a physician assistant, Brown had good eye contact, coherent thought processes, and good insight. She was not withdrawn or agitated. Her mental health symptoms appeared to be controlled by medications, despite situational stressors. Admin. R. 25, 384-385. In September 2011, Brown had run out of her prescribed antidepressant and appeared agitated and depressed in response to derogatory comments from her father. Admin. R. 25, 381. By the next month, after restarting her medications, she appeared to be functioning well again, and she terminated counseling. Admin. R. 25, 377.

At a medical check up in February 2012, Brown denied depression or panic attacks and said her antidepressant medication was working to level her mood. She made good eye contact, had coherent thought processes, and was not tearful or withdrawn. She spoke confidently and laughed throughout the examination. Brown reported she was working as a dog groomer. The physician assistant said her mental health issues were currently stable, but encouraged her to decrease her alcohol consumption due to its potential adverse contribution to depression and anxiety. Brown declined counseling. Admin. R. 26, 369. At another medication check in June 2012, Brown said she had been abstaining from alcohol after getting a DUI. She said her mood had been level, although she continued to have episodes of anxiety due to situational stress. She denied being particularly depressed or tearful. The physician assistant observed that she appeared to be upbeat and positive, without agitation, fidgeting, or symptoms of depression. Admin. R. 26, 365.

Brown had a brief period of significant difficulty in July 2012 when she took an intentional overdose of prescription drugs after a family argument. The ALJ noted evidence that Brown was evasive and manipulative concerning her drinking and drug use. Admin. R. 26, 466, 472, 474, 477. After a medical hospitalization to treat physical effects of the overdose, including pneumonia, Brown

was admitted for inpatient psychiatric care on August 1, 2012. Admin. R. 26, 448. After a brief hospital course in which she restarted her medications, Brown's mood rapidly improved and she was able to participate in group sessions. Admin. R. 27, 446. When she was discharged on August 3, 2012, Brown was oriented and had full affect, euthymic mood, and logical thought processes. Her judgment and insight were fair to good and she denied delusions and suicidal ideation. Admin. R. 447.

On August 20, 2012, Brown saw James Hylton, M.D. for a medication check. Dr. Hylton observed that Brown was pleasant, alert, and oriented, with a normal train of thought and a good sense of humor. She was accompanied by a supportive friend who told Dr. Hylton that Brown was "back to normal." Brown said she had a good support network and an action plan for coping with stressful situations, should they arise. Admin. R. 27, 767-768.

In September 2012, at a post hospitalization follow up with Dr. Velez, Brown said she was doing very well and she appeared alert and oriented, with full affect and logical thought processes. Her insight and judgment were good. Her mood was mildly irritable. Brown said she thought her medication regimen was losing effectiveness and Dr. Velez agreed to start different medications for depression and anxiety. Admin. R. 758. In October 2012, Brown told Dr. Velez she was doing very well on the new medications, but wanted to increase the dosage of her antidepressant. She reported that she was reading a lot of books, getting more involved in her church, and dealing with family interactions in a positive way. Dr. Velez found her alert and oriented, with full affect and euthymic mood. Her thought processes and associations were logical, her thought content was normal, and her insight and judgment were fair to good. Admin. R. 27, 754.

On October 25, 2012, Brown's father took her to the emergency room after she made vague references suggesting she might become suicidal again if her father did not give her money. At the hospital, Brown admitted she was not suicidal and had no suicidal ideation. She said she was frustrated and angry because her father would not help her financially and she could not work without derailing her application for disability benefits. Hospital staff observed that she was cooperative and interactive with a bright affect. She was alert, oriented, calm, and cooperative. Her speech and memory were within normal limits, thoughts were logical and coherent, and responses were appropriate. Admin. R. 27-28, 507, 509. Brown admitted to her counselor that she felt she had to manipulate men to get money, including implied threats of suicide to her father. Admin. R. 753. Brown resumed counseling with Ms. Shin, who said Brown spoke freely with appropriate affect and appeared to be coping well with stressors. Admin. R. 28, 746, 748, 749, 752.

In January 2013, Brown told Dr. Hylton that her moods were cyclical and that she wanted to try a mood stabilizing medication. Dr. Hylton found her pleasant, alert, and in tune with her condition with a good sense of humor. He added Lamictal to Brown's medication regimen. Admin. R. 29, 744. In her sessions with Ms. Shin during the following months, Brown appeared to be benefitting from the added medication, feeling better overall, laughing more, having good dreams, and waking up happy. She was attending church regularly, thinking about volunteering to care for elderly people, and wanted to start a dog grooming business. She was attending mandatory meetings of an alcohol treatment group and felt able to keep impulsiveness in check while abstaining from alcohol. Ms. Shin noted that Brown was largely positive and appeared to be functioning well, speaking freely with an appropriate affect. Admin. R. 29-30, 742, 743, 875, 878, 882, 883.

In September 2013, Brown went to the emergency room reporting an increase in depression due to situational stressors, including being told by her father to move out of his apartment complex, being kicked out of a shelter for intoxication, and worrying about her brother's recent heart surgery. Notably, Brown was not taking her prescribed medications. The emergency room doctor said she appeared depressed, but not in imminent risk of harming herself. Her speech was clear, coherent, and normal in rate, rhythm, and volume. Her thoughts were logical and linear. Emergency room staff provided her prescription medications and discharged her in fair condition. Admin. R. 30, 799, 811, 815. Ms. Shin said Brown's distress was based on a combination of situational stressors and medication withdrawal, and sent her to refill her prescriptions. Admin. R. 30, 868, 872. In October, Brown showed marked improvement in her mental health after stabilizing on her medications. Admin. R. 30, 865-866. In February and March 2014, Brown said she was doing well on her medications and appeared to be coping adequately with stressors in her life. Admin. R. 31, 829, 850-852. In April, however, Brown went to the emergency room reporting suicidal ideation and thoughts of overdosing. Medical staff related this exacerbation of symptoms to a recent change in medications to which she had not stabilized. Admin. R. 31, 886-887.

These treatment records support the ALJ's determination that Brown generally functioned well while stabilized on medications. Impairments that are controlled by medications are not disabling. *Warre v. Comm'r of Soc. Sec. Admin.*, 439 F.3d 1001, 1006 (9th Cir. 2006). The episodes of exacerbated symptoms that appear in the record coincide with noncompliance with treatment and with periods of stabilization after changes in her medications. Admin. R. 20, 24, 34. The record also supports the ALJ's view that Brown demonstrated a focus on obtaining disability benefits to solve her financial strain, familial conflicts over support, and other situational stressors. Admin. R. 35.

Evidence of motivation to obtain financial benefits may support an adverse inference as to the claimant's subjective statements about the limiting effects of symptoms. *Matney v. Sullivan*, 981 F.2d 1016, 1020 (9th Cir. 1992).

The ALJ properly considered the opinion evidence offered by the state agency medical experts. Lloyd Wiggins, M.D., opined that Brown's physical impairments were not severe enough to adversely impact her ability to work, and Sandra Lundblad, Psy.D., opined that Brown's mental impairments caused no more than mild functional limitations in her ability to work. Admin. R. 31, 32, 109, 121. These opinions support the ALJ's determination regarding the limiting effects of Brown's symptoms. Notably, the ALJ gave Brown the benefit of the doubt by finding her far more limited than the experts opined. Admin. R. 31-32.

The ALJ also found that Brown engaged in activities that were not consistent with debilitating symptoms. Admin. R. 35-36. This is a reasonable basis for finding a claimant less impaired than she claimed. *Orn v. Astrue*, 495 F.3d 625, 639 (9th Cir. 2007). For example, Brown engaged in social interactions such as involvement in her church community, living in a dormitory setting, daily grocery shopping, visiting with neighbors and friends, and using public transportation, among other activities. Admin. R. 21, 24-27, 29-30, 36, 241-243, 286-287. Brown also reported working as a caregiver and dog groomer after the alleged onset of disability. Admin. R. 36, 315, 368, 380-382. The ALJ found these activities inconsistent with Brown's subjective symptoms, such as not being able to be around others or engage in physical activities. Admin. R. 35-36

The ALJ also considered Brown's work history and noted that her alleged onset of disability coincided with the date she was fired for taking unscheduled breaks. Admin. R. 22, 35, 51, 225. When a claimant stops working for reasons unrelated to disability, it may reasonably cast doubt on

a subsequent claim that she cannot work due to a disabling medical condition. *Bruton v. Massanari*, 268 F.3d 824, 828 (9th Cir. 2001).

The ALJ articulated clear and convincing reasons for his evaluation of Brown's subjective symptoms and his findings are supported by substantial evidence in the record. *Carmickle*, 533 F.3d at 1160; *Smolen v. Chater*, 80 F.3d at 1281-82. His findings are sufficiently specific to satisfy me that he did not arbitrarily discredit Brown's subjective statements about the intensity, persistence and limiting effects of her symptoms. Accordingly, I find no error in the ALJ's evaluation. *Tommasetti*, 533 F.3d at 1039; *Carmickle*, 533 F.3d at 1160.

### III. Global Assessment of Functioning

Brown contends the ALJ erred by failing to give sufficient weight to the GAF scores assigned by mental health treatment providers. A GAF score reflects a clinician's judgment about the severity of a patient's symptoms or the level of overall functioning at the time of the assessment. Admin. R. 32. *Diagnostic and Statistical Manual of Mental Disorders* (4th ed. 1994) ("DSM IV") 33.

In July 2012, while Brown was hospitalized after overdosing on her medications, treatment providers assigned GAF scores of 15-20, 25, 29, and 30. Admin. R. 32, 478, 560, 569. At discharge on August 3, 2012, however, Brown was assessed a GAF of 55, which indicates either moderate symptoms or moderate difficulty in broad categories of function. Admin. R. 32. 446, 522. DSM IV 34.

In September 2013, when Brown was not taking her prescribed medications and sought urgent help from the emergency department, her GAF was assessed at 42 and 45. Admin. R. 32, 799, 825. Then in April 2014, when Brown visited the emergency department with increased

emotionality while trying to stabilize after a change in medications, her GAF was 35. Admin. R. 32, 887.

The ALJ did not reject these opinions, but gave the GAF scores little weight in assessing Brown's general level of functioning while compliant with treatment and stabilized on her medications. Admin. R. 32. The ALJ correctly noted that the GAF scores reflected only Brown's level of functioning during brief episodes of acute distress while she was not stabilized on medications. The ALJ reasonably relied on the longitudinal treatment records and the evidence in the record as a whole to provide a better assessment of her general functioning. Admin. R. 32. This is a reasonable interpretation of the evidence in the record, and it will not be overturned. *Robbins*, 466 F.3d at 882; *Batson*, 359 F.3d at 1193; *Andrews*, 53 F.3d at 1039–40.

### IV. Other Contentions

Brown contends the ALJ erred by failing to include a limitation in her RFC indicating that she must use a cane at work. The record reflects that, Brown used a cane briefly in April 2013 and in February 2014, after twisting her knee. Admin. R. 23-24, 865, 873, 880. The ALJ did not find that a cane was medically necessary for Brown to engage in work, and that is a rational interpretation of the evidence in the record. Accordingly, it will not be overturned. *Robbins*, 466 F.3d at 882; *Batson*, 359 F.3d at 1193; *Andrews*, 53 F.3d at 1039–40.

Brown contends the ALJ elicited testimony from the VE with hypothetical assumptions that did not include all of the limitations described in her subjective statements or limitations reflecting her low GAF scores. The ALJ elicited testimony from the VE based on hypothetical questions that accurately reflected his assessment of Brown's RFC. Admin. R. 72. The VE testified that jobs exist in the national economy that a person with the described RFC could perform. Admin. R. 72-73.

Because I find no error in the ALJ's RFC assessment, the hypothetical limitations posed to the VE were also free of error, and the VE's testimony satisfied the Commissioner's burden to show there are jobs in the national economy that Brown could perform. *Andrews v. Shalala*, 53 F.3d at 1043. The ALJ was not required to include additional hypothetical limitations he found unsupported by the record. *Osenbrock v. Apfel*, 240 F.3d 1157, 1163-65 (9th Cir. 2001).

## CONCLUSION

For the foregoing reasons, the Commissioner's final decision is AFFIRMED.

DATED this 5 day of Sept, 2017.

Robert E. Jones, Senior Judge
United States District Court